WARREN COUNTY ET AL. *v.* EDWARD H. NALL, STATE LAND COMMISSIONER.*

1. STATUTORY CONSTRUCTION. *Governmental grants. Ordinary conveyances. Technical terms.*

   A legislative grant of lands, acquired by the state from the general government in trust for a public purpose. to a county, in furtherance of such purpose, is not a donation, and rules for the construction of governmental gifts should not be strictly applied thereto. Such a grant does not require for its validity the use of the technical terms found in ordinary conveyances of land, and should be sustained if it can reasonably be done.

2. SAME. *Transposition of sentences.*

   The canons of construction authorize a transposition of the sentences of a statute when so to do makes legislative intent manifest and harmonizes the entire statute.

3. SAME. *Laws, called session* 1852, pp. 94, 95. *Swamp and overflowed lands.*

   The act of October 19, 1852 (laws called session 1852, pp. 94, 95). granting to Warren county the swamp and overflowed lands (acquired by the state under act of congress, approved September 28, 1850), lying in said county, between the Mississippi river and the hills, is not void for uncertainty of description.

4. SAME. *Right of selection.*

   The said act of 1852 by its proviso limited the county to 50,000 acres of said land, but conferred on the county the right to select the same from the larger quantity embraced within the description.

---

*Judge Calhoon having been of counsel, recused himself. R. H. Thompson, Esq., was appointed and acted in this case as special judge in his place.

5. SAME.  *Right continuous.  Yet in force.*

The right of selection and sale conferred on Warren county by said
act is a continuous one and has never been impaired.

6. SAME.  *Contemporaneous construction.*

A legislative grant which was treated as valid for nearly fifty years
by the officials of the state, including its chief executive, should
not be held void by the courts if it can reasonably be avoided.

7. COUNTIES, LANDS OF.  *Excision.  Placed in another county.*

The lands of a county do not cease to belong to it because they are
excised by legislative act and placed in another county.

8. SAME.  *Exempt from taxation.  Code* 1880, § 468.  *Code* 1892, § 3744,
par. (c).

The lands of a county are exempt from taxation although situate in
another county, under code 1880, § 468, and code 1892, § 3744, par.
(c).   The exemption is as broad, notwithstanding variant lan-
guage, under the one code as the other.

FROM the chancery court, first district, of Hinds county. .
HON. HENRY C. CONN, Chancellor.

Warren county and another, appellants, were complainants
in the court below; Nall, state land commissioner, was defend-
ant there.   The opinion fully states the case.

*Miller, Smith & Hirsh* and *F. R. Foster,* for appellants.

It is competent for the legislature to grant swamp lands to
the different counties in the state and empower them to sell
the lands and devote the proceeds to general county purposes.
*Rock* v. *Rinehart,* 88 Iowa, 37; *Killer* v. *Brickey,* 78 Ill., 133;
*Whiteside County* v. *Burchell,* 31 Ill., 68; *Beaurreau County*
v. *Thompson,* 38 Ill., 566.

That the words employed in the act of 1852 constituted a
grant *in præsenti* has already been determined by this court,
and is not now open to discussion.   *Fore* v. *Williams,* 35 Miss.,
533; *Killer* v. *Brickey,* 78 Ill., 133; *Smith* v. *Miller,* 105
Iowa, 688; *Bailey* v. *Callanan,* 87 Iowa, 108; *Railroad Co.*
v. *Smith,* 9 Wallace, 95; *Shaw* v. *Kellog,* 107 U. S., 312;
*Wright* v. *Roseberry,* 121 U. S., 488.

The validity of legislative grants does not depend upon technical terms. *Ward* v. *Bartholomew*, 6 Pick., 409; *Rutherford* v. *Green's heirs*, 2 Wheat., 196.

In the case at bar the legislature conveyed all the swamp lands in Warren county, between the Mississippi river and the hills, to said county, and authorized the county to sell and make good and valid titles. This language is plain, unambiguous and needs no construction, and if there is any doubt created, it is by the terms of the proviso. But the defendants seem to argue this case as if the proviso constituted the entire act, by seeking to maintain that the language of the proviso is indefinite and uncertain as to the land conveyed, and, by practically ignoring the granting part of the act, attempt to defeat the county's title. The title of the county does not depend upon the proviso, but upon the granting clause, and the language there, as stated, is unmistakable and the character and boundaries of the land conveyed are defined with technical accurateness. But considering the proviso with the granting part of the act and there can be no difficulty in determining the will of the legislature. All the land was conveyed to the county of Warren for a specific purpose, and being thus vested with the legal title to all the land, the legislature, possibly owing to the uncertainty as to the extent of the area granted, and not knowing positively whether there were fifty, sixty or more thousand acres in the grant, limited the county's beneficial interest under the provisions of that act, in the property to 50,000 acres.

It placed the title of all of it in the county with the right to convey good and valid title, but the county can sell only 50,000 acres thereof under the act. This state of facts does not present a case of the conveyance of 50,000 acres of unidentified lands, and all the authorities, therefore, applicable to uncertainties of description are not important. Statutes should receive a sensible construction, such as will effectuate the legislature's intention and avoid, if possible, an unjust or absurd conclusion. In *Re Chapman Petitioner*, 166 U. S., 661;

*United States* v. *Denver & Rio Grande Railroad Co.*, 150 U. S., 1; *Wisconsin Central Railroad Co.* v. *Forsythe*, 159 U. S., 55; *United States* v. *Southern Pacific Railroad Co.*, 146 U. S., 570; *Mitchell* v. *Wells*, 37 Miss., 241; *Lemonius* v. *Meyer*, 71 Miss., 514; *Smith* v. *Furbish*, 47 L. A. Rep., 226.

*Mayes & Harris*, on same side.

The act of 1852 cannot be properly understood or valued without a preliminary consideration of the history of the swamp land grants made by the United States to the various states in the year 1850. The court will find that statute set forth in full in *Wright* v. *Roseberry*, 121 U. S., 488. The grant was properly accepted by the various states, and the lands were appropriated to the purposes designed.

"Soon after the passage of this act, the question arose as to the time the grant took effect; whether at the date of the act or on the issuance of the patent to the state upon the request of the governor after the lists and plats of the lands were made out by the secretary of the interior and transmitted to him. . . The language of the first section of the act indicates a grant *in præsenti* to each state of lands within its limits of the character described. Its words, 'shall be, and are hereby, granted' import an immediate transfer, not a promise of a transfer in the future. It was only when the other sections of the act were read that a doubt was raised as to the immediate operation of the act. On the one hand it was contended that those sections postponed the vesting of title in the state until the lands granted were identified and a patent of the United States for them was issued. On the other hand, it was insisted that effect must be given to the clear words of the granting clause of the first section, which, *ex vi termini*, import the passing of a present interest, and that, in consistency with them, the other provisions of the act should be regarded as simply providing the mode of identifying the lands and furnishing documentary evidence of their identification, and not as a limitation upon vesting the right to them in the state." *Wright* v. *Roseberry*, 121 U. S., 488.

The court will note carefully this decision, which is the accumulation of a long line of previous decisions on the same subject, that the inchoate title to these lands vested immediately in the state by the grant itself, and the fact that the statute called for the execution of a subsequent patent was not an arrest or suspension of the vestiture of the title until the patent should issue. The swamp land grant so made was for the specific purpose of protecting the lands so granted from overflow through their management and sale by the state, the manifest object of congress being to augment the values of property and of the lands in the states themselves, whereby the United States government would derive an immediate, though a secondary, benefit, the federal government not being provided with the machinery for developing the lands through its own agencies. It is true that, as subsequently has been decided, this grant did not constitute a contract between the state on one hand and the United States on the other that the proceeds should be applied exclusively to levee or drainage purposes, nor did it constitute a technical trust of such proceeds, but it was the institution of a relation between the state and the United States based on good faith between the sovereignties, and while no citizen could interfere in case such good faith was not observed, yet, nevertheless, the obligation of honor and good faith did exist, and is expressly asserted in the decisions of the supreme court of the United States. *United States* v. *Louisiana*, 127 U. S., 182, and earlier cases therein cited. It was this interest so created in 1850 with which the legislature of Mississippi in the year 1852 (being the first session of the legislature after the passage of the act of congress making the grant) undertook to deal.

At the regular session of 1852 the following acts were passed:

1. An act, approved March 3, 1852 (laws 1852, p. 132), granting 35,000 acres of the swamp lands in Homochitto swamp to the commissioners of the Homochitto river, and also grant-

ing all swamp and overflowed lands on Leaf river to the commissioners for Leaf river.   Sections 1 and 10.

2. An act, approved March 12, 1852 (laws, p. 99), granting the swamp and overflowed lands on Pearl river in certain counties named, to the commissioners of the southern district of Pearl river.   Section 2.

3. An act, approved March 15, 1852 (laws, p. 41), providing for the issuance of land scrip to the counties of DeSoto, Tunica, Coahoma, Bolivar, Washington, Issaquena and Sunflower, such scrip to be located, among other lands, on the swamp lands aforesaid situated within said counties. Section 12.

4. An act, approved March 16, 1852 (laws, p. 31), making it the duty of the governor to take steps necessary to procure from the United States the location of the lands under the swamp-land grant and the patents thereof from the secretary of the interior.

5. An act, approved March 16, 1852 (laws, p. 33), providing that, " on all of the rivers and streams east of the western base of the hills bordering on the Mississippi bottom, from the Louisiana line to a point opposite the mouth of the Yazoo river, and on all the rivers and streams east of the western base of the hills bordering on the bottoms of the Yazoo and Tallahatchie rivers, the swamp lands donated as above should be and were granted to the counties in which such lands were situated; and also appropriating 60,000 acres of the swamp lands situated in the counties of Tallahatchie, Holmes, Carroll and Sunflower to the improvement of the navigation of the Yazoo, Tchula and Tallahatchie rivers up to the mouth of Coldwater.   Sections 1 and 7.

It will be observed that in all this legislation there was no provision for Warren county and no appropriation or donation of the lands lying therein.   The entire subject was not exhausted; wherefore, at the succeeding session of the legislature, which was a special session, of October, 1852, among other minor bills, the following additional legislation was had:

1. An act approved October 18, 1852 (laws, p. 73), appropriating to the county of Tunica 100,000 acres, and to the county of DeSoto 36,000 acres of the swamp lands aforesaid.

2. An act approved October 19, 1852 (laws, p. 94), entitled, "An act to aid the construction of levees in Warren county and for other purposes," ceding 50,000 acres of lands to the county of Warren for levee purposes. And the last act is the one which is the basis of the controversy in this case.

It is strenuously contended by adverse counsel that this act making the session to Warren county is void on its face for uncertainty; that inasmuch as it is a grant of a determinate number of 50,000 acres out of the larger quantity without any other terms of definition or identification, it is void. We dissent entirely from the view of counsel in this particular, and contend that the act is valid and enforceable. One fallacy in the argument of adverse counsel consists in the twofold proposition: (1) That this act is to be brought to the test of those rules which determine the validity of a deed between individuals; and (2) that in so far as a different rule shall apply because of the fact that it is a government grant, the rule of construction is even stricter in favor of the government than it would be in a deed between individuals. In this counsel is altogether in error. In the first place the court will remember that, as this court was careful to observe in the case of *Jones* v̇. *Madison County*, 72 Miss., 798, this grant was not a donation in any proper sense of the term, and the rule of construction applicable to donations does not apply. It was not a donation, simply because it was only the practical working out of an improvement scheme inaugurated by the Congress of the United States, and to the carrying out of which the state was pledged in good faith. In the second place the court will remember that the method of construction and treatment of a legislative grant was long since settled in the case of *Rutherford* v. *Green*, 2 Wheat., 196, where the supreme court of the United States said, "It surely cannot be necessary now to say that the valid-

ity of a legislative act depends in no degree on its containing the technical terms usual in a conveyance."

" It is the duty of the court to sustain and locate a grant when it can by any reasonable possibility be done." *Phillips* v. *Crabtree* (Tenn., 1899), 52 S. W. Rep., 787. "A grant shall not perish if we can spell out its meaning." *Funna* v. *Manning*, 11 Hum., 311. "A patent is not void for uncertainty unless both the exterior boundaries and the exclusions are uncertain." *Hall* v. *Martin*, 89 Ky., 9; *Ballowe* v. *Hillman*, 37 S. W. Rep., 950 (Ky.)

It is manifest that the proposition of counsel in connection with these government grants is not a practically working proposition, and the construction for which he now contends has never been one which has been invoked or applied in all the antecedent history of this state.

The statute contains terms which authorize the county itself to make the selection. The whole effect of the statute is, first, a grant of 50,000 acres out of the total area, and, secondly, a grant of authority to sell the 50,000 acres or any part thereof, for manifestly it was never intended that the board of police should sell the whole 50,000 acres as one body or not at all, and under the statute every sale made operated, of course, as a selection by the county of so much of the 50,000 acres granted. Manifestly so. It is impossible that the county should sell the lands without selecting the lands to be sold, by the very act of sale. *Hempstead* v. *Underhill*, 20 Ark., 237; *Bailey* v. *Callanan*, 87 Ga., 107.

Now the bill alleges, and that allegation is, of course, admitted by the demurrer, that the company has been, at intervals, selling these lands all along, and the bill alleges, furthermore, that the county has sold to its co-complainant, Metzger, and has executed to him deeds therefor conformably to the statute, all these very lands in controversy. And we claim that this is a selection made by the county in strict conformity to the au-

thority of the statute. It is not contended, so far as we know, that this statute has ever been in terms repealed.

Assume that the act does not contain any method of identification, it is yet a good "float." *United States* v. *McLaughlin,* 127 U. S., 428; *Carr* v. *Quigley,* 149 U. S., 652; *United States* v. *Oregon,* etc., *Co.,* 69 Fed. Rep., 899.

Governor McRae's patents were not needed to invest the county of Warren with a vested, vendible interest in the lands, or to invest the county with a vendible title to the same. All that these patents needed to do was to identify the lands and perfect the inchoate but vested and vendible title which had already been granted and vested by the statute. The statute created a vested interest although an inchoate title, and the only function of the patent was to identify and segregate the lands. *Rutherford* v. *Green,* 2 Wheat., 196; *Wright* v. *Roseberry,* 121 U. S., 488; *Rogers Works* v. *Society,* 164 U. S., 559; *Bailey* v. *Callanan,* 87 Iowa, 103; *Downs* v. *Downs,* 2 How. (Miss.), 915; *Anderson* v. *Lewis,* Freem. (Chy.), 178; *Fore* v. *Williams,* 35 Miss., 533; *State* v. *Sioux City,* etc., 7 Neb., 357.

In *Downs* v. *Downs,* supra, the precise question was before the court. In that case the State of Georgia, in the year 1875, passed an act by which John Donaldson and others were each allowed 10,000 acres of land, to be located by them on the Tennessee river. The land was not located in the act, or otherwise described. It simply provided that the lands should be located by the grantees, but how or when was not prescribed. The supreme court said (p. 926): "It is here insisted that he had no interest which was the subject of the grant of conveyance, that he had a bare possibility. Let us see how this is. The act or resolution of Georgia declares that 10,000 acres of land shall be allowed to William Downs, to be laid off by him on the Tennessee river. The terms used clearly vest a present interest. 'Allowed,' when and how? At the passage of the act and by virtue thereof. At what place? On the Tennessee river. It is true the grant is not located to any particular

spot or piece of ground by metes and bounds, and no right to enjoy any such was vested by the act of Georgia at the time of its passage, but an interest was vested at that time, which, by an act to be done by the parties themselves, is to vest an interest or right to a particular tract of land, and which it needed no further enactment to vest in him who was the subject of the grant. This view of the subject, were there any doubt, will be found to be amply sustained by authority.''

Now, the authority granted to Downs to make the location was not a whit more specific than the authority granted to the board of police of Warren county to make the selection by making sales. Whatever might be the question as to lands unsold out of the general lands, so far as the board has sold lands, there can be no question. But to go back to the governor's patents. The county of Warren having received by the act of 1852 a vested interest, whether arising to the dignity of a legal title or only an equitable title, it only remained for the lands to be identified, and this was done by the governor's patent. The issuance of that patent was not a legislative act, but was only ministerial. It was a purely executive function. *Veeder* v. *Guffy*, 3 Wis., 507; *United States* v. *Stone*, 2 Wall., 525; *Saltmarsh* v. *Crommelin*, 35 Ala., 54. The constitution of 1832 was in force at that time. Under that constitution we claim the following provisions gave the governor full authority to make a patent having the effect claimed for the patent in question:

ARTICLE 2, Section 1.—'' The powers of the government of the State of Mississippi shall be divided into three distinct departments. and each of them confided to a separate body of magistracy, to wit: Those which are legislative to one, those which are judicial to another, and those which are executive to another.'' This distribution was exhaustive, and all of the executive authority of the government was invested in the executive magistracy.

ART. 5, Sec. 1.—'' The chief executive power of this state

shall be vested in a governor, who shall hold his office for two years from the time of his installation." *Sallmarsh* v. *Crommelin*, 35 Ala., 54.

ART. 5, Sec. 9.—"He shall take care that the laws be faithfully executed." *Cunningham* v. *Neagle*, 135 U. S., 1.

ART. 5, Sec. 12. — "There shall be a seal of this state, which shall be kept by the governor and used by him officially, and shall be called the great seal of the State of Mississippi."

*Monroe McClurg*, attorney-general, and *Green & Green*, for appellee.

"The words of a private grant are taken most strongly against the grantor, though if the meaning cannot be discovered the instrument is void. But this rule is reversed in public grants. They are construed strictly in favor of the government, on grounds of public policy. If the meaning of the words be doubtful in a grant, designed to be of general benefit to the public, they will be taken most strongly against the grantee and for the government, and therefore, should not be extended by implication, in favor of the former, beyond the natural and obvious meaning of the words employed. Any ambiguity in the terms must operate in favor of the government. Whatever is not unequivocally granted is taken to be withheld. Whether the rule be of property, franchises or privileges, it is construed strictly in favor of the public; nothing passes but what is granted in clear and explicit terms." Sutherland on Statutory Construction, sec. 378, and cases.

In *United States* v. *Arredondo*, 6 Pet., 738, there is a compilation of the rules applicable to public grants, and therein it is declared that "public grants convey nothing by implication; they are construed strictly in favor of the king. . . . . The grantee is restrained to the place and shall have no lands out of it by the generality of the grant referring to it, as of land in A. in the tenure of B., the grant is void if it be not both in the place and tenure referred to. . . . . The

general words of a king's grant shall never be so construed as to deprive him of a greater amount of revenue than he intended to grant, or to be deemed to be to his or the prejudice of the commonwealth. . . . . In order, therefore, to ascertain what is granted, we must first ascertain what is included in the exception, for whatever is included in the exception is excluded from the grant.''

In *Mills* v. *St. Clair*, 8 How. (U. S.), 581, it is said: '' First, that in a grant like this, designed by the sovereign power making it to be a general benefit and accommodation to the public, the rule is, that, if the meaning of the words be doubtful, they shall be taken most strongly against the grantee and for the government, and therefore should not be extended by implication in favor of the grantee beyond the natural and obvious mean ing of the words employed; and, if these do not support the right claimed, it must fall. . . . . Secondly, if the grant admits of two interpretations, one of which is more extended, and the other more restricted, so that a choice if fairly open and either may be adopted without any violation of the apparent objects of the grant, if, in such case one interpretation would render the grant inoperative and the other would give it force and effect, the latter, if within a reasonable construction of the terms employed, should be adopted. . . . . Now, in view of these facts and consequences, and applying them to language of an ambiguous character, and seeking assistance from a settled rule of construction in case of doubt, and find- ing that rule of construction to be that when two constructions are equally open to the court the one should be adopted most favorable to the government, the consequence must be,'' etc.

In *Richmond Railroad Co.* v. *Louisa Railroad Co.*, 13 How. (U. S.), 81, it was said: '' The rule of construction in all such cases is now fully established to be this, ' that any ambiguity in the terms of the contract must operate against the corpora- tion and in favor of the public, and the corporation can claim nothing but what is clearly given by the act.' See *Charles*

*River Bridge* v. *Warren Bridge*, 11 Pet., 541." *Slidell* v. *Grandjeau*, 111 U S., 437.

In *Gaines* v. *Coates*, 51 Miss., 342, the foregoing rules were approved by this court, and wherein it is declared: "Any ambiguity or doubt arising out of the terms used by the legislature must be resolved in favor of the public. *Minturn* v. *LaRue*, 23 How. (U. S.), 435. Public grants are to be construed strictly. 11 Pet., 420." Where two parts of an act conflict, the great weight of authority is that the whole act is void. Sutherland on Statutory Construction, sec. 220. In this state it was held that where the first clause of a statute conveyed title, and there was a later clause in the same statute repugnant to the first, that the former would prevail. *Fore* v. *Williams*, 35 Miss., 533, although the contrary was held by *Com. Bank* v. *Chambers*, 8 Smed. & M., 9. But while there is a division of opinion as to the effect of contradictory clauses of an act of equal dignity, there is no doubt as to the effect of a proviso upon the body of the act. "By a singular caprice of the law, a saving clause totally repugnant to the purview is rejected, while a proviso directly repugnant to the main body of the act repeals the purview, as it is said to speak the last intention of the lawmakers." Sutherland on Statutory Construction, sec. 221; Sedgwick on Const. & Stat. Law (2d ed.), 49; 23 Am. & Eng. Enc. L. (1st ed.), 483; 23 Am. & Eng. Enc. L. (1st ed.), 228; *Com. Bank* v. *Chambers*, 8 Smed. & M., 9.

The fact that Governor McRae executed patents to Warren county for these lands could confer no title, as no authority was granted to the governor to make deeds or select the lands to be conveyed. The act, if valid, is self-executing as a conveyance, and the patents executed by Governor McRae are void. Nor do these patents strengthen the county's title as a recognition by the executive department of the right of the county to the lands. It would have the contrary effect, for, if the act was valid and conveyed the lands by its terms, no patent was necessary, and the attempt to make one was a recognition that the

means selected by the legislature of vesting the title was inoperative and void. So, too, the alleged refusal of the legislature to interfere in the matter evidences the opposite of the contention. For, if the lands had always been the property of the state, and the legislature knew this fact, it would not commit itself to the recognition of Warren county's title in any way. Besides, no interpretation by the officers of state, by conduct, could make certain the description of the lands on this grant and vest title in the county. If so, an acknowledgment by parol of a gift of land could vest title contrary to the statute of frauds. This grant was void *ab initio*.

The change of boundary of Warren county so as to include these lands in Issaquena county, put them outside the purpose of the act of 1852. The donation was for the protection of the lands themselves by the construction of levees. This purpose is incompatible with the change of the lands themselves from the jurisdiction of Warren county to Issaquena county, and with the creation of levee districts and putting Warren in part in that district and putting the lands themselves in Issaquena county, which was, under the jurisdiction of the police power, delegated to the levee board of the Mississippi levee district. These lands thus became (1) outside the jurisdiction of Warren county, and therefore it was incapable of executing the purpose of the grant for levee purposes in its county; (2) in the jurisdiction of Issaquena county, and it, in turn, in the jurisdiction *quoad hoc* of Mississippi levee district; (3) by a part of Warren county being added to Mississippi levee district the jurisdiction of this police power was expressly taken from it and vested in Mississippi levee district, in denial of the delegation of the power to construct levees in the county, and hence the purpose of the act of 1852 was abrogated. The revocation of the object of the agency certainly revokes the delegation of authority of the agent.

By the legislative change of boundary and the transfer of the lands from Warren county to Issaquena county, the title

to all of these lands became divested out of Warren county, if vested by the act of 1852 in it.

When the land, public property, was excised from Warren county it ceased to be owned by Warren county. The legislative will is supreme, and unless, in changing the boundaries, conditions are imposed, none exist, and the public county property ceases to belong to the county from which it is excised. *Chickasaw County* v. *Sumner County*, 58 Miss., 619; *Clay County* v. *Chickasaw County*, 64 Miss., 534; *Adams* v. *Railroad Co.*, 76 Miss., 721; Dillon on Mun. Corp., sec. 128 and note sec. 188; 7 Am. & Eng. Enc. L., 968 *et seq.*, 966, 914; *Harris* v. *Whiteside Co.*, 105 Ill., 445; Cooley on Const. Lim., 289, 293; 2 Wend., 209.

The sale of these lands for taxes, if they are the private property of Warren county, conveyed a good title. The only objection urged in the bill to this tax sale is that the lands were not taxable, being the property of Warren county. The sale for taxes creates a valid title unless the taxes were paid or there are no taxes due. With the power to tax county property, and especially private property of the county, the statute declared that the following property and no other shall be exempt: ''Property real and personal belonging to the county within the same.'' The property is territorially defined—that within the county. The exemption extended to that and none other. In the code of 1892 these words, ''within the same,'' were omitted. The property being private property, as contended, and being in Issaquena county, was not property of Warren county '' within the same,'' and, hence, was subject to taxation. Exemptions from taxation being in derogation of the common right, are strictly construed.

Argued orally by *E. Mayes* and *J. Hirsh*, for appellant, and by *M. Green*, for appellee.

THOMPSON, Sp. J., delivered the opinion of the court.

This case is an appeal from the chancery court, first district,

of Hinds county.   As the pleadings were primarily framed, Warren county was the complainant, and Nall, land commissioner, the representative of the state, and one Metzger, were defendants.   Before the trial in the chancery court, by agreement of the parties, Metzger was treated, and is to be treated by us, as a complainant.

It is claimed in the bill that the lands in controversy were acquired by Warren county from the state under a grant made by the legislature in 1852; that the. particular land in controversy, or most of it, was sold by the county to Metzger a short while before the filing of the bill, the county retaining a lien on the land for the purchase money, a large part of which is yet unpaid; that by act of the legislature in 1876 the lands were excised from Warren county and put in Issaquena county; that they were exempt from taxation, but that, ignoring the exemption, they were sold for taxes by the tax collector of Issaquena county in 1890, ·and purchased by the state at the tax sale.   It is further charged that the state, through the land commissioner, is asserting title to the lands, offering them for sale, etc.; and the bill seeks to have the title adjudged in Metzger, subject to the county's lien as to most of the lands at least, if not all of them.   It is difficult to tell from the record whether Metzger purchased all the lands in suit from the county, but the agreement that Metzger shall be treated as a complainant and appellant, has relieved us from the necessity of adjuding that fact; and the bill further sought the cancellation of the state's claim as a cloud on the real title asserted to be in complainants.   To this bill the state, through the land commissioner, demurred, contending (1) that the grant of 1852 was utterly void on its face, for uncertainty as to what lands were intended to be granted; (2) that, if the grant be held valid, it only invested the county with title for a governmental purpose, to wit, the erection and maintenance of levees, and that the act under which the county held was repealed, by implication, in 1858, when the state inaugurated a general levee system, and

by further acts in furtherance of said system; (3) that, if the lands were not taken away from Warren county by the levee acts, they ceased to belong to that county when they were excised from its territory and placed in the county of Issaquena; (4) that the lands, if they had not ceased before to belong to Warren county, were, after being placed in Issaquena, no longer exempt from taxation, and the state acquired title at the tax sale. The court below resolved some one or more of these questions against the complainants. It sustained the demurrer and dismissed the bill, and complainants, Warren county and Metzger, have appealed, and all of said questions were argued before and presented to this court and are now to be determined by us.

The principal question in this case requires us to construe an act of the legislature, approved October 19, 1852 (laws called session 1852, pp. 94, 95), entitled "An act to aid the construction of levees in Warren county, and for other purposes," and which act is in these words:

"SECTION 1. *Be it enacted by the legislature of the state of Mississippi*, That so much of the land granted by congress to the State of Mississippi by an act to enable the State of Arkansas and other states to reclaim the swamp lands within their limits, approved September 28, 1850, as lies in Warran county between the Mississippi river and the hills, be, and the same are hereby, ceded to the said county of Warren, for the purpose of constructing, repairing and keeping up the levees in that county, and the board of police of said county may, and they are hereby authorized to, sell and dispose of said land in such manner and in such quantities as they may deem best calculated to accomplish the object aforesaid, and make good and valid titles thereto, the deeds to be executed by the president, under the order of the board; but the board of police of said county shall not sell or dispose of any portion of said land for any other object or purpose than for constructing, repairing or keeping up the levees in said county; *Provided*, Said county shall not

have or sell more than fifty thousand acres under the provisions of this act.

"SEC. 2. *Be it further enacted,* That this act take effect and be in force from and after its passage.

"SEC. 3. *Be it further enacted,* That the provisions of the above sections be, and they are hereby, extended to the county of Adams, so as to include such swamp lands in the county of Adams as are included in the grant of swamp lands to this state, and not granted to the commissioners of the Homochitto river, for the purpose of constructing a levee from Ellis' cliffs, on the Mississippi river, to the mouth of Buffalo bayou, and the said swamp lands are hereby granted for said purposes to the board of police of Adams county."

It is an admitted fact that there were more than 50,000 acres of land (about 56,000) within the description given in the first section of the act, and it is contended for the appellee that by reason of the proviso thereto the entire first section of the statute is wholly void, and the cession to Warren county inoperative. It is also an admitted fact that the board of police of Warren county and the board of supervisors thereof—the latter board being the successor of the former—since the passage of this act, more than forty-eight years ago, have exercised at various dates during the long number of years mentioned, the powers conferred upon them, and that the governor of the state in 1857 (forty-four years ago) executed, under the great seal of the state, patents purporting to convey the lands here involved to the said county; but these acts by the county authorities are sought to be treated as utterly void because of the assumed invalidity of the statute above quoted, and the patents are claimed to be ineffectual to invest title, because no express legislative authorization for their issuance by the governor can be found. Is the act making the cession to Warren county void on its face for uncertainty? Is it void because it purports to convey a determinative number of acres (50,000) out of a larger quantity, without any further terms of definition or

identification? That is the question. It must not be over-
looked that the act, were there no proviso embodied in it (and
from the proviso alone the difficulties of construction arise), was
in no proper sense a donation to the county. The legislative
history of the swamp and overflowed lands granted by congress
to the several states September 28, 1850, carries conviction to
our minds that the act under consideration was an effort by the
legislature of the state to work out the improvement scheme
inaugurated by congress, to which the swamp and overflowed
lands were devoted, and to which the state had in good faith
pledged itself. We do not think, therefore, that all the rules
to be found in the books for the construction of governmental
gifts should be applied in their strictness to the legislative grant
under consideration. Nor do we think that the validity of a
legislative act depends in any degree on its containing the tech-
nical terms used in ordinary conveyances of lands. We be-
lieve that the true rule applicable to the question before us re-
quires the court to sustain this legislative grant, if it can be
reasonably done. The rule should be observed, especially, we
think, in a case like this, where the state itself received the
land from the general government, pledging its faith that it or
its proceeds should be devoted to the accomplishment of a pub-
lic purpose, the grant under consideration being a manifest
effort to keep that faith and appropriate the land to the ac-
complishment of the purpose for which it was designed by con-
gress. And this rule of construction should, we think, be most
liberally applied in a case, also, like this, where to wholly con-
demn the grant would be suggestive of a violation by the state
itself of its integrity and honor, or at least be seemingly to
stultify itself, and where to annul the grant would be to reverse
contemporaneous construction of the act by the county authori-
ties and the chief executive of the state, fully acquiesced in by
the legislature for nearly a half century. We must sustain the
grant here involved, or we must adjudge that the legislature
of the state in 1852 enacted a solemn farce. To declare an act

of the legislative department of the government void because violative of the constitution has frequently been declared to be the most serious of the duties imposed by law on the judiciary, and we are warned by the highest authority that it should never be done when there is some other ground upon which the litigation can be rested, and it should be done only when the rights of a party to a suit require it. It is equally as serious a matter for a court to adjudge an act of the legislature void on the assertion that, or because, its terms are so contradictory as to destroy it and deprive it of all meaning and effect. It should not be done if there be any reasonable way of escape from so doing.

With a desire, therefore, to give the act under consideration some effect, if it can be reasonably done, let us examine its terms. It must be presumed that the legislature intended to accomplish something. It must have meant to devote at least some portion of the swamp and overflowed lands in Warren county for the purpose of constructing, repairing and keeping up the levees in that county. If it did not mean to do that, it did not mean anything. Unquestionably that part of the first section of the act which precedes the proviso contemplated what we have just stated as the necessary meaning of the entire section, if any meaning whatever can be given it as a whole.

What, then, is the meaning of the proviso, ''said county shall not have or sell more than 50,000 acres under the provisions of this act?''. In considering this, let us first determine to what the proviso is applicable. A careful reading of the section and the proviso leads us to conclude that the proviso is simply and only a limitation upon the quantity of land to pass by the grant. It is not a proviso to or limitation on the power of the board of police, conferred by the first section, ''to sell and dispose of the said lands [that granted] . . . and to make good and valid titles thereto.'' A simple transposition of the proviso, so as to place it just following that part of the section upon which it is a limitation, will aid, we think, in the

construction of the act.  We then have the act thus:  "So much of the land  .  .  .  [granted to the state by congress September, 1850] as lies in Warren county, between the Mississippi river and the hills, be, and the same is hereby, ceded to the said county of Warren;  .  .  .  *Provided,* Said county shall not have or sell more than 50,000 acres under the provisions of this act; and the board of police of said county may, and they are hereby authorized to, sell and dispose of said lands in such manner and in such quantities as they may deem best calculated to accomplish the objects aforesaid, and to make good and valid titles thereto,  .  .  .  but the board of police of said county shall not sell or dispose of any portion of said land for any other object or purpose than for constructing, repairing or keeping up the levees in said county."   We think the canons of construction authorize this transposition of the act, and we think by so doing its real meaning is brought out with some degree of distinctness.   Our observation of legislative proceedings leads us to believe that the proviso was, most likely, introduced by way of an amendment to the original of section 1, and that the proviso had no other purpose than to limit the quantity of land to be passed by the grant.   So, transposing the proviso and reading the section, it is the exact equivalent of a grant of 50,000 acres of land out of the entire area, with power in the board of police to sell and dispose thereof—that is, of the 50,000 acres—in such manner and in such quantities as the board might deem best, and to make good and valid title thereto.

We are strengthened in our conclusion that the proviso to the first section of the act is alone a limitation on the quantity of land granted, and in no way impairs the powers of the board of police to sell and make valid deeds to the land, by a consideration of the third section.   That section extends the provisions of the first section (meaning, of course, the powers and rights of the board of police) to Adams county, and it defines the lands in that county to which the powers are to be applica-

ble with legal certainty.    Certainly the board of police of
Warren county, the whole act considered, had as great power
over the 50,000 acres in that county as the Adams county board
had over the lands mentioned in the third section of the act.
We think that the legislature by the act under consideration
meant to give the county of Warren the right to sell and make
good and valid titles to 50,000 acres of the lands granted to
the state by congress September 28, 1850, located in said
county between the Mississippi river and the hills, and that the
right to sell and make titles by necessary implication. invested
the county with the right of selection.    It must be remembered
that the entire body of land was dedicated to the purposes men-
tioned in the act, as well as the 50,000 acres.    The construc-
tion of levees in Warren county was in the line of carrying out
that purpose.    The legislature, by the act of 1852, practically
said to the board of police of the county, "You may sell and
dispose of 50,000 acres of said land, and you are authorized to
make good titles thereto, the proceeds to be used in furtherance
of the purpose to which the land is already pledged."    In such
case the right to sell and convey must be held to have given
the right of selection.    The right to sell implies the right to
find a purchaser, and under the grant, as we construe it,' the
board of police or supervisors could sell any portion of the
area within the description of the act for which a purchaser
could be found, and this right continues until 50,000 acres are
sold.    Then the grant will be exhaused.    We think it likely
that the inability of the legislature to determine what parts of
the greater area could be most readily and promptly sold,
coupled with a desire to speedily construct the levees, was in-
fluential in giving the form to the act in which it was passed,
and we believe that it was intended to, and that the act did,
invest the county authorities with the right of selection.

Governmental grants of a defined quantity of land within a
larger area have frequently been upheld by the courts.    Some-
times questions have arisen as to when the title passed to the

grantee, whether at the time of the grant or upon selection; sometimes as to how and by whom selection was to be made, and sometimes between the grantee and subsequent purchasers from the government of lands within the larger area, and much learning is to be found in the books in respect to these questions. It is unnecessary for us to consider them, since the rights and powers conferred by the act of 1852 are continuing, and the sale by the county authorities of Warren county to Metzger, said sale and all previous ones not embracing 50,000 acres of land, passed the title, and the state was thereafter without any claim thereto.

We find it unnecessary to decide whether or not, before sale by the county, it was in the power of the legislature to revoke the grant and select some other agency than the board of police or supervisors of Warren county for carrying its purpose into execution; nor are we now concerned with the right of the legislature to dispose of such of the lands, if any, as have never been sold by the county authorities. In our judgment, the legislature has never expressly or by implication repealed the act of 1852. No one of the levee laws, nor all of them combined, has or have this effect.

We do not think that the excision of the lands involved in this suit from Warren county and placing them in Issaquena county in any way affected the rights of Warren county. The sale of the lands for taxes by the tax collector of Issaquena county was void. The land belonging to the county was exempt from taxation, whether situate within or without the limits of the county owning the same. Code 1880, § 468. The words of said section declaring that the "property, real or personal, belonging to the United States, or this state, or to any county or incorporated city or town within the same," etc., shall be exempt from taxation, includes the lands of a county located in another county of the state. The terms, "within the same," in the phrase above quoted, relate to the location of the county, city or town, and not to that of the

property.    This meaning is brought out perhaps more distinctly in the code of 1892, § 3744, par. (*c*), which exempts from taxation "all property, real or personal, belonging to this state, or any county or municipal corporation thereof," but the exemption is as broad under the one code as the other.

*Reversed and remanded, with leave to defendant to answer the bill within sixty days after the filing of the mandate in the court below.*